UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BASHIR IBRAHIM HMEID                                    CIVIL ACTION

VERSUS                                                 NO. 18-3449

NELSON COLEMAN CORRECTIONAL                            SECTION "J" (2)
CENTER ET AL.

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff, Bashir Ibrahim Hmeid, is a prisoner currently incarcerated in the Tensas

Parish Detention Center ("Tensas") in Waterproof, Louisiana.  He filed this complaint pro

se and in forma pauperis pursuant to 42 U.S.C. § 1983 against the Nelson Coleman

Correctional Center ("Coleman"), Deputy Charles Floyd, Deputy David Bailey, Lieutenant

Rocco Dominic and Sergeant Darryl Richardson.

Hmeid asserts six claims: (1) While incarcerated in Coleman on August 17, 2017,

Deputies Floyd and Bailey, Lieutenant Dominic and Sergeant Richardson used excessive

force against him when they tased and beat him during a strip search.  (2) He did not

receive adequate medical care for a wrist injury that existed before he was incarcerated or

for the injuries he suffered on August 17, 2017.  (3) There is a lack of privacy in the

Coleman bathroom and shower areas, and the food and the jail are cold.  (4) Jail officials

tampered with his mail.  (5) Coleman inmates do not receive adequate recreation time.  (6)

State Department of Corrections ("DOC") and parish inmates should not be housed

together because parish inmates are disruptive.  Hmeid originally sought transfer from

Coleman, but he has been transferred to Tensas since filing his complaint. Record Doc. No. 4 (Complaint at ¶ V).

On May 22, 2018, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Steven Mauterer, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and its progeny. After the <u>Spears</u> hearing and pursuant to my order, defense counsel submitted to me the videotape of the subject tasing incident and the incident report that plaintiff referred to during his testimony, and I have reviewed them in connection with this report. Record Doc. Nos. 16, 18-20.

## **THE RECORD**

I.    <u>PLAINTIFF'S TESTIMONY</u>

Plaintiff testified that he is currently incarcerated in Tensas based upon a conviction on June 15, 2017, for simple burglary, for which he is serving a six-year prison sentence. He stated that his release date is February 10, 2023. He confirmed that his claims in this case are based principally on an incident that occurred while he was incarcerated in Coleman on August 17, 2017. Hmeid testified that he was transferred from the Jefferson Parish jail to Coleman on June 22, 2017, and that he remained there until April 2018.

Hmeid confirmed that he asserts several claims in the instant case. First, he testified that on August 17, 2017, he was tasered and beaten while handcuffed in the shower. Plaintiff stated that on that date he was in his bed for the 11:00 p.m. lockdown, and about 10 minutes into the lockdown Deputies Bailey and Floyd instructed him and his cellmate

to go downstairs to the shower area to be strip searched.  Hmeid testified that he took his clothes off, and "whatever the officer ordered or asked me to do, I did it."  He stated that he opened his mouth, and he squatted and coughed.  Plaintiff testified that the officers told him that he had to bend at the waist, spread his buttocks and cough.  In response, Hmeid said, "I've never heard of that.  I know DOC regulations."  He stated that he refused to bend at the waist because it was a violation of his privacy rights.  Plaintiff testified that the guards told him it was their procedure, and that he would go to lockdown if he did not comply.

Hmeid testified that about 10 officers surrounded him and told him that he would go to segregation lockdown if he did not bend at the waist and spread his buttocks.  Plaintiff testified that he felt humiliated because the guards were looking at him and making gestures and comments.  He stated that Sergeant Richardson and Lieutenant Dominic pulled out their tasers and pointed them at his forehead while saying, "You're going to follow procedure."  Hmeid asserted that the second time the tasers were pointed at him, he got scared and complied with the order to bend at the waist and spread his buttocks.  Plaintiff testified that the officers yelled out, "He didn't do it right," and then tasered, beat and kicked him.  "They got on top of me, and I started screaming."

Hmeid testified that after he was tased and taken to the ground, he was handcuffed behind his back.  Plaintiff testified that he stopped resisting after he was handcuffed, but that there were officers on top of him who continued to kick and beat him for 10 to 15 minutes.  He stated that he was not tasered again after he was handcuffed, but that his

shoulders and knees were bleeding. Plaintiff testified that he was kicked and punched after he was handcuffed, but he did not know who was beating him because he was on his stomach and it was difficult to turn around. Hmeid identified Deputy Bailey, Sergeant Richardson, Lieutenant Dominic and Deputy Floyd as the officers who were present during this incident. Hmeid asserted that the video surveillance footage from the dorm could verify what happened, and that other inmates housed in his dorm heard but did not see the incident.

Hmeid testified that after the incident his head was bruised, he had a major headache, his arm was twisted, the handcuffs were tightened around his wrist and both of his shoulders and knees were bleeding. He stated that he was taken to the infirmary, where Sergeant Richardson took pictures of his injuries. Plaintiff testified that he reviewed his medical records that I ordered defendants to produce, Record Doc. Nos. 5, 17, and they are accurate. He noted that the records were missing the video of the incident and the photographs taken in the infirmary after the incident. Defense counsel confirmed that he had the video, photographs and an incident report in his possession, copies of which he would send to the court for review.

Hmeid testified that the only people who saw the incident were the guards and a fellow inmate who was also in the shower area during the strip search. He asserted that other inmates heard the incident from the second-story of the cell block, including Justin Robicheaux, David Lee and Howard Burl. Plaintiff stated that the dorm was small, housing

- 4 -

only about 20 inmates, and other inmates heard what was happening but were not allowed to look down from the balcony to see into the shower area below.

Plaintiff testified that Coleman's policy that inmates bend at the waist and spread their buttocks during strip searches violated his privacy rights. He stated that he was sent to lockdown five to 10 times for disciplinary reasons after the incident, and that each time he went to lockdown he was strip searched. Hmeid testified that he felt this policy "was just unnecessary."

Hmeid affirmed that, in addition to his claims concerning the strip search and tasing incident, he also asserted claims concerning his conditions of confinement at Coleman. Hmeid testified that the food at Coleman was left on carts in the hallways for hours. "If you don't eat, they don't care. They'll just take it, put it back in the kitchen and say they fed you." Hmeid stated that the cold temperature in the jail resulted in him "staying sick" and frequently having colds.

Hmeid complained that the lack of walls between the urinals, the toilets, the shower area and the rest of the dorm was a privacy violation because "it's disrespectful and fights escalate from that." He stated that the guards stare at the inmates from a glass observation "pod" while they shower and use the restroom. Plaintiff confirmed that his complaint is that the guards can see him while he is engaged in these activities, which are supposed to be private.

Plaintiff testified that he did not receive medical attention for problems with his arm, elbow, wrist and hand, which had all been operated on before his incarceration at Coleman. Hmeid stated that he experienced pain "when it's cold inside the dorm, due to the screws in my arm and the plate in my hand." Plaintiff stated that the doctor gave him only Tylenol for the pain associated with his previous injuries and surgeries. He testified that he saw a doctor or nurse at Coleman every couple of weeks to address these problems.

Hmeid also testified that he did not receive adequate medical care in September 2017, after the tasing incident, when he complained of pain in his side and that "he couldn't even get up out of the bed." He confirmed that he saw a doctor about pain in his side on September 19, 2017, and that his related urinalysis test produced negative findings.

Plaintiff testified that prison officials tampered with his mail. He stated that some of his legal papers, including documents related to the instant lawsuit and others related to his criminal case, were missing after he came out of lockdown. "I filed a complaint, and finally they put it all in a manilla envelope and some of it was just missing. There was paperwork that I needed that I couldn't ever find." Plaintiff testified, however, that this did not cause any problems with the court and that his legal proceedings were not disrupted. He stated that he was represented by an attorney in his state court criminal case. Hmeid testified that he did not find the paperwork he needed to file for post-conviction relief, and he is unsure whether his attorney filed a post-conviction application.

- 6 -

Hmeid also complained that inmates at Coleman were taken outside for recreation only once or twice a week for 30 to 35 minutes.  He stated that he would "just walk around" when he went outside.  He asserted that the DOC mandates that inmates are entitled to at least 45 minutes of recreation once every day.

Finally, plaintiff testified that Coleman housed parish inmates and DOC inmates in the same dorms, and he complained that this structure led to fights.  He testified that "people come off the streets,[] a guy that's never been in jail a day in his life, and they put him right there in the same dorm as me and he does a lot of violating."  Hmeid stated that he got into a verbal argument with a parish inmate who stole his cup, but he testified that the argument did not escalate into a physical altercation.  Plaintiff asserted that parish inmates and DOC inmates should not be housed together.

On cross-examination, Hmeid confirmed that the officers asked him not to squat but to bend.  When asked whether he complied when the officers asked him multiple times to bend at the waist, Hmeid testified that he did not comply at first but that he did when he became scared.  "They threatened me to make me bend over by the waist, so I had to follow procedures because I ain't had no choice."  He stated that he failed to bend at the waist multiple times until he got aggravated when he felt that the officers' requests became "a joke."

Hmeid again confirmed that his medical records are accurate, but he complained that the missing photos and video of the incident should be included.  When asked whether he had any taser prong injuries, Hmeid said, "I don't know.  I was in shock.  I was hurting

physically and mentally.  I was hit with a tase[r] and beaten, that's all I remember."

Plaintiff defined the feeling of being "tased" as shaking and shivering, and he said, "I felt

like I was about to die."  He testified that he saw red dots from the taser on his body, and

that "some type of string and some type of metal thing" came out of the taser gun, hit him

and was "pulled out fast."  He stated that he then fell to the floor, where he was laying on

his stomach with his arms behind his back.  He testified that he did not remember where

the taser hit him.  Plaintiff further testified that he momentarily lost consciousness and was

dragged out of the dorm after the incident.

## II.    VIDEO AND INCIDENT REPORT

Upon plaintiff's request and in compliance with my order, defendants submitted a

video of the August 17, 2017 incident to me for in camera review.  The post-incident

photographs referred to by Hmeid in his testimony were contained in the same compact

disc as the video.  Record Doc. No. 20.  The video of Hmeid's strip search, which has no

sound, begins after midnight at 00:25:00.  The time stamp is in the upper right-hand corner

of the video.  A wide-angle view of the two-level dorm shows some prisoners in their beds

on the second level while others, including Hmeid, are strip searched below in the shower

area.  Hmeid is in the front of the shower on the far right.  He undresses, raises his arms,

turns to face the shower wall, squats twice then turns to face the officer behind him and

shrugs his shoulders.  Hmeid continues to gesture emphatically, and he seems to be arguing

with the officer in front of him and other officers just outside of the shower area.  At

00:28:37 two officers approach the shower where Hmeid, another inmate and two officers

- 8 -

are standing.   Again, Hmeid raises his arms, turns around and squats multiple times (00:29:40).  One of the four officers points a taser at Hmeid's left shoulder (00:31:11), Hmeid moves to the right wall of the shower, he falls or is taken to the floor and is then surrounded by five officers (00:31:46).  At this point in the video, Hmeid is no longer visible, except for occasional flashes of his feet.

At about 00:33:30, the video shows that guards stand him up, and two guards escort him out of the dorm, down multiple hallways to a solitary cell.  Red marks are visible on Hmeid's right shoulder, but Hmeid is talking, walking, and standing without issue when an officer enters his solitary cell.  This portion of the video has sound.  An officer attempts to get Hmeid to perform a proper strip search (1:00:30).  Hmeid continues to squat instead of bending at the waist, as instructed.  The officer takes Hmeid's mattress as he leaves, and the video concludes with Hmeid walking toward his bunk.

Defendants also submitted (1) a "St. Charles Correctional Center Incident Report" from August 17, 2017 at 3:15 a.m., which was written by Deputy Bailey; (2) two "Use of Force/Discharge of Firearm" reports from August 17, 2017 at 12:31 a.m., one signed by Lieutenant Dominic and another signed by Deputy Bailey; and (3) two Axon taser information reports on taser devices carried by Lieutenant Dominic and Sergeant Richardson.

In the incident report, Deputy Bailey states that Deputy Floyd conducted Hmeid's strip search at around 12:27 a.m.  Deputy Bailey writes that Hmeid refused to comply with Deputy Floyd's instructions – despite Deputy Floyd's warnings that Hmeid would be sent

to disciplinary segregation if he did not comply – and at 12:29 a.m., Sergeant Richardson stepped in and gave Hmeid verbal commands that Hmeid continued not to follow. The incident report indicates that Sergeant Richardson pulled out his department-issued taser at 12:31 a.m., in an effort to induce Hmeid's compliance, but that none of the officers involved in the incident actually used their tasers on Hmeid.  Deputy Bailey states that he and Lieutenant Dominic placed Hmeid in a prone position to be handcuffed, and that Hmeid resisted while being handcuffed.  Lieutenant Dominic's and Deputy Bailey's reported explanation for Hmeid's injuries is that he slipped on the water-resistant floor in the shower area, which led to abrasions on his right shoulder, left index finger and both knees.

## ANALYSIS

### I.    STANDARDS OF REVIEW

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless of whether it has also been filed in forma pauperis.  28 U.S.C. § 1915A(a); Thompson v. Hicks, 213 F. App'x 939, 942 (11th Cir. 2007); Lewis v. Estes, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998);  Lewis v. Sec'y, DOC, No. 2:10-CV-547-FTM-29, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), aff'd, 589 F. App'x 950 (11th Cir. 2014).  After review in the screening process, the court must "identify cognizable claims or dismiss the complaint" if it or portions of it are frivolous or fail to state a claim upon which relief can be granted.

28 U.S.C. § 1915A(b)(1); Lewis, 589 F. App'x at 952; Thompson, 213 F. App'x at 942;

Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  Davis, 157 F.3d at 1005.  The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual

nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon additional evidence, as long as it is properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents." Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).

After a Spears hearing, the complaint may be dismissed, in whole or in part, as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under

Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's medical care, conditions of confinement, mail tampering, recreation and housing classification claims against defendants must be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims.  However, his complaint against the individual defendants, as amended by his testimony at the Spears hearing and construed broadly,[1] requires further proceedings and should not be dismissed at the screening stage.

## II.    EXCESSIVE FORCE

Hmeid alleges that officers used excessive force when they tased him, threw him to the ground and beat him after he was handcuffed.  Plaintiff was a convicted prisoner at the time of the incident about which he complains.  The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"  Wilkins v. Gaddy, 559 U.S. 34, 34 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 4 (1992)).  The

---

[1]The court must "liberally construe briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel," Smith v. Lonestar Constr., Inc., 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

Supreme Court in <u>Wilkins</u> confirmed that the standards it established in <u>Hudson</u> remain the law.

> The "core judicial inquiry," we held [in <u>Hudson</u>], was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S. Ct. 995; <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319-321 . . . (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ." <u>Hudson</u>, 503 U.S. at 9 . . . .
>
> . . . . As we stated in <u>Hudson</u>, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9 . . . . "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Ibid.</u> (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. <u>Ibid.</u> (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)).

<u>Id.</u> at 37-38.

The Supreme Court in <u>Wilkins</u> "left open the possibility of dismissal where the injury conclusively shows that the force applied was not unconstitutional." <u>Williams v. Jackson</u>, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing <u>Wilkins</u>, 130 S. Ct. at 1180) (emphasis added). <u>Wilkins</u> confirmed that <u>Hudson</u> remains the touchstone for evaluating claims under the Eighth Amendment. Thus, the Fifth Circuit's prior cases that relied on <u>Hudson</u> continue to provide binding legal standards for this court.

Under the Eight Amendment and Section 1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Hudson</u>, 503 U.S. at 6; <u>accord</u> <u>Petta v.</u>

Rivera, 143 F.3d 895, 901 (5th Cir. 1998); Flowers v. Phelps, 956 F.2d 488, 491 (5th Cir.

1992).  Plaintiff need not show a significant injury to establish a constitutional violation;

however, the extent of injury may be considered in determining whether the force used was

malicious, wanton or unnecessary.  Hudson, 503 U.S. at 7; Flowers, 956 F.2d at 491.  In

addition, "[t]he Eight Amendment's prohibition of cruel and unusual punishment excludes

from constitutional recognition de minimis uses of physical force, provided that the use of

force is not of a sort 'repugnant to the conscience of mankind.'"  Siglar v. Hightower, 112

F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 503 U.S. at 9-10).

> The law thus
>
> require[s] a plaintiff asserting an excessive force claim to have suffered at
> least some form of injury . . . . [W]e do not permit a cause of action for every
> contact between a citizen and a police officer.  In just about every
> conceivable situation, some amount of force or contact would be too nominal
> to constitute a constitutional violation.  When the force used is insufficient
> to satisfy the legal standard necessary for recovery, the amount of force is de
> minimis for constitutional purposes.

Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted).  To determine

whether injury caused by excessive force is more than de minimis for constitutional

purposes, the context in which the force was used and all the surrounding circumstances

must be examined.  Id.

At this early screening stage of the case, plaintiff's assertions must be construed in

his favor, without credibility determinations.  Applying this standard, I find, at least at this

time, that Hmeid's complaint, broadly construed and expanded upon by his Spears

testimony, states a viable excessive force claim requiring further proceedings.  Fifth Circuit

case law addressing the use of taser guns in the excessive force context supports an officer's use of a taser gun to subdue inmates and suspects in some situations. The Fifth Circuit has not expressly addressed the use of taser guns to subdue a convicted inmate's noncompliance with procedural orders. Recently, in Cadena v. Ray, the Fifth Circuit held that an officer's use of a taser on a suspect who continued to resist arrest did not violate the plaintiff's Fourth Amendment rights because

> tasing is permissible "after [a suspect] continuously fail[s] to comply and "resist[s] handcuffing," particularly when it is not "the first method to gain . . . compliance." But we have also said that tasing is inappropriate where either it is unclear that the plaintiff was resisting or the plaintiff was not resisting at all. Here, four officers helped "take down" [plaintiff], and the video evidence clearly shows that he nonetheless continued to resist handcuffing. Only after the Officers tried conventional methods to subdue [plaintiff] did [an officer] intervene with the taser.
>     In Poole [v. City of Shreveport], we also approved the use of a taser as a response to escalating resistance. Though the video does not clearly show when [the officer] fired the second taser round, it does show that immediately after the first taser shot [plaintiff] swiped at one of the arresting officers with his arm. [The officer] could have reasonably interpreted [plaintiff's] swipe as an escalation of resistence, justifying the second taser shot as a proportional response.

728 F. App'x 293, 297 & n. 20-22 (5th Cir. 2018) (citing Poole v. City of Shreveport, 691 F.3d 624 (5th Cir. 2012); Pratt v. Harris Cty. Tex., 822 F.3d 174, 182 (5th Cir. 2016); Darden v. City of Fort Worth, 800 F.3d 722, 729-31 (5th Cir. 2018); Pena v. Rio Grande City, 879 F.3d 613, 619-20 (5th Cir. 2018)) (emphasis added).

In the Eight Amendment context, other circuits have held that the use of a taser gun is not a de minimis application of force. For example, in Lewis v. Downey, the Seventh Circuit held that an officer's use of a taser gun on a non-compliant inmate was not de

minimis, and that a genuine issue of material fact precluded summary judgment.  581 F.3d

467, 475-78 (7th Cir. 2009).  The court reasoned that

> pain, not injury, is the barometer by which we measure claims of excessive
> force, and one need not have personally endured a taser jolt to know the paint
> that must accompany it.  Thus, we hold, as the first rung in the ladder of our
> analysis, that the use of a taser gun against a prisoner is more than a de
> minimis application of force.

Id. at 475 (citing Hudson v. McMillan, 503 U.S. 1, 9 (1992)) (additional citations omitted).

In the second rung of the court's analysis, the Lewis court considered the officer's state of

mind when he discharged the taser, and held that a genuine dispute of material fact existed.

> In many circumstances–often when faced with aggression, disruption, or
> physical threat–compelling compliance with an order is a valid penological
> justification for use of a taser.  But such justification does not necessarily
> exist every time an inmate is slow to comply with an order.  What must be
> decided in each case, and the issue to which we next turn, is whether the facts
> surrounding   the   taser's   deployment–as   [plaintiff]   portrays
> them–demonstrated actual malice or sadistic purpose on the part of the user.
> . . .
> The exact sequence of events leading to the taser's use in this case is strongly
> disputed . . . . [W]e find several facts troubling: the absence of any agitation
> or threat from [plaintiff]; the short passage of time between [the officer's]
> order and the taser shot; [the officer's] single, unrepeated order; and the
> dearth of warnings regarding the consequences of [plaintiff's] failure to
> comply.

Id. at 477-78 (citations omitted).  The Seventh Circuit included a survey of other circuits'

opinions in which the use of a taser was upheld when the victims were "violent, aggressive,

confrontational, unruly, or presented an immediate risk of danger to themselves or others.

Id. (citing Jasper v. Thalacker, 999 F.2d 353 (8th Cir. 1993) (Eighth Circuit condoned the

use of taser to subdue the inmate who verbally threatened then lunged at a guard); Caldwell

v. Moore, 968 F.2d 595 (6th Cir. 1992) (Sixth Circuit upheld use of stun gun against aggressive inmate who shouted at jailer and kicked cell door for seven hours, even after warnings that he would be forced to comply if he did not calm down); Hunter v. Young, 238 F. App'x 336, 339 (10th Cir. 2007) (Tenth Circuit upheld use of taser to force compliance with an order given moments after inmate's physical altercation with officers)).

In addition, federal courts have often found that a prisoner stated a cognizable claim for excessive force when he alleges an officer's use of force after a prisoner has been restrained.  See, e.g., Fennell v. Quintela, 393 F. App'x 150, 152, 155 (5th Cir. 2010) (Prison officer allegedly grabbed handcuffed inmate's wrist and twisted them, resulting in injury, while his arms were confined in a cell's food tray slot.); Watts v. Smart, 328 F. App'x 291, 292, 293-94 (5th Cir. 2009) (evidence that defendants struck prisoner without provocation while he was in restraints created genuine fact issues whether force applied was excessive); Morris v. Trevino, 301 F. App'x 310, 313 (5th Cir. 2008) (Prisoner stated a claim for excessive force when he alleged that, despite his lack of provocation, officer twisted his arms into painful positions while his hands were handcuffed behind his back, yanked his hands through the tray slot opening of his cell, beat and punched on his arms, and punched him in the face).

Applying the foregoing legal principles in this case, I find that Hmeid states a cognizable Eight Amendment excessive force claim for the following reasons.  Assuming the truth of Hmeid's allegations, the officers continued to use force on Hmeid after he was handcuffed and no longer resisting.  The video of the incident is largely inconclusive as to

whether Hmeid was merely non-compliant with a procedural order or aggressively threatening or escalating in his resistance to the officers in a way that might have justified the force used. During his <u>Spears</u> hearing, Hmeid testified that he was kicked and punched by four officers <u>after</u> he was handcuffed and face-down on the ground. He also described metal prongs from a taser gun hitting his body. While the photographs taken of Hmeid in the infirmary after the incident show only minor short-term injuries, I cannot conclude as a pleading matter that Hmeid's injuries, especially the abrasions on his shoulder, were merely de minimis.

As the caselaw outlined above demonstrates, such fact allegations are frequently held sufficient to survive the screening and/or Rule 12(b)(6) stage of these kinds of cases. Accordingly, I recommend that plaintiff's excessive force claim not be dismissed at this time and that it be preserved for further proceedings.

## III.    MEDICAL CARE

Hmeid was a convicted inmate at all times about which he complains concerning his medical care while incarcerated in Coleman. In <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976), the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. <u>Id.</u> at 105-06; accord <u>Gregg v. Georgia</u>, 428 U.S. 153, 182-82

(1976).  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 847 (1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.

In the Section 1983 medical care context, a showing of deliberate indifference to serious medical needs "requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"  Brewster v. Dretke, 587 F.3d 764, 770 (5th Cir. 2009), cert. denied, 130 S. Ct. 3368 (2010) (quoting Domino v. Tex. Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added).  "Mere negligence or a failure to act reasonably is not enough.  The

officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).

> The Supreme Court has recently affirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391 (1997). The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (additional citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

Initially, it cannot be concluded that the side pain and post-operative issues with his arm, elbow, wrist and hand or the minor abrasions, bruises, lacerations and red marks after the tasing incident that plaintiff described presented a serious medical need for constitutional purposes. Certainly, plaintiff has not suffered "a life-long handicap or permanent loss" of the type many courts require to constitute a serious medical need for constitutional purposes. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Peltzer, 536 U.S. 730, 739 (2002) (citing Monmouth Cty. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical need is serious when it "results in an inmate's suffering a 'life-long handicap or permanent loss'")); see also Fourte v. Faulkner Cty., 746 F.3d 384, 389 (8th Cir. 2014) (high blood pressure readings alone do not indicate serious medical need); Banks v. Mannoia, 890 F. Supp. 95, 99 (N.D.N.Y. 1995) ("bowel problems" and headaches not considered serious

medical problems); <u>Griffin v. DeRobertis</u>, 557 F. Supp. 302, 306 (N.D. Ill. 1983) (aches and sore throat not serious).  <u>Dickson v. Colman</u>, 569 F.2d 1310, 1311 (5th Cir. 1978) (no serious medical need when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health).  Neither his medical records nor his testimony indicate that the alleged treatment deficiencies about which he complains had any actual deleterious effect on his physical condition.

Even assuming, however, without concluding that plaintiff's conditions presented serious medical needs for constitutional purposes, Hmeid has alleged facts, confirmed by his testimony and the medical records, that negate any inference of deliberate indifference by jail officials.  His complaint, as amended by his testimony and confirmed by the medical records, shows that he received constitutionally adequate medical care while incarcerated in Coleman.

Hmeid testified, and the medical records confirm, that while incarcerated at Coleman, he was seen by a physician and other medical personnel every couple of weeks after the tasing incident, and he was provided with Motrin, Tylenol, Neosporin and Bandaids.  He was given urinalysis in response to his complaint of "side pain" to address whether kidney stones might be a cause of the pain, but the test was negative. Under these circumstances, it cannot be inferred that jail personnel were deliberately indifferent in any way to plaintiff's medical conditions.  <u>See</u> <u>Malone v. Waggener</u>, 296 F. App'x 422, 422-23 (5th Cir. 2008) (no deliberate indifference when defendants provided plaintiff with Tylenol rather than Flexeril for his pain); <u>Radunz v. Muhlhausen</u>, 375 F. App'x 618, 620-21 (7th

Cir. 2010) (no deliberate indifference when inmate received regular medication).  While

it is clear from his allegations and testimony that Hmeid is not satisfied with the speed or

nature of his medical care, and that he experienced some delay in his initial treatment, no

finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide addition treatment is a classic example
> of a matter for <u>medical judgment</u>.  A showing of deliberate indifference
> requires the prisoner to submit evidence that prison officials refused to treat
> him, ignored his complaints, intentionally treated him incorrectly, or engaged
> in any similar conduct that would clearly evince a wanton disregard for any
> serious medical needs.  Deliberate indifference is an extremely high standard
> to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis

added).  No such showing has been made on the current record.  In Hmeid' case, the

decision made by the treating medical providers to render the care that they gave, rather

than the more extensive care he desires, are classic examples of the exercise of "medical

judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate

indifference in the constitutional sense.

Contentions like Hmeid's that amount to a disagreement with the speed, quality or

extent of medical treatment or even negligence do not give rise to a Section 1983 claim.

"[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a

constitutional violation, malpractice or negligent care does not."  <u>Stewart v. Murphy</u>, 174

F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious

medical condition that ultimately resulted in death does <u>not</u> constitute deliberate

indifference, even if treatment was negligently administered); <u>see</u> <u>Corte v. Schaffer</u>, 24 F.

3d 237, 1994 WL 242793, at *1 (5th Cir. 1994)) (Contrary to plaintiff's allegation that he had received "no treatment" because he believed he needed a referral to a specialist, he failed to demonstrate deliberate indifference when he was seen by prison medical personnel with results being within a normal range.); Mendoza v. Lynaugh, 989 F.2d 191, 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference).

Plaintiff's complaints in this case about medical care fail to state a claim of violation of his constitutional rights sufficient to obtain relief under Section 1983 because he cannot establish "deliberate indifference" under the applicable constitutional standard.   His medical care claim must therefore be dismissed.

IV.    CONDITIONS OF CONFINEMENT

A)    Cold Food and Cold Jail Temperature

Hmeid was a convicted prisoner at all times that form the basis of his claims in this case.   Regardless of whether an inmate is a pretrial detainee or a convicted prisoner, however, the standard of liability is the same for episodic acts or omissions of jail officials of the type alleged in this case.  McCarty v. Zapata Cty., 243 F. App'x 792, 794 (5th Cir. 2007) (citing Gibbs v. Grimmette, 254 F.3d 545, 547 (5th Cir. 2001); Hare v. City of Corinth, 74 F.3d 633, 636 (5th Cir. 1996)); Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999).  In Hare, the Fifth Circuit held

> (1) that the State owes the same duty under the Due Process Clause and the Eight Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's <u>liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm</u> to a pretrial detainee but responded with deliberate indifference to that risk.

<u>Hare</u>, 74 F.3d at 650 (emphasis added).

Here, nothing in plaintiff's particular situation or in the circumstances concerning his conditions of confinement as described in his written submissions and <u>Spears</u> testimony leads to an inference that the conditions he described were the result of a prison official's act either "implement[ing] a rule or restriction or otherwise demonstrat[ing] the existence of an identifiable intended condition or practice" or that the "official's act or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." <u>Id.</u> at 645. Thus, the complained-of harm is a particular act or omission of one or more officials, and the deliberate indifference standard enunciated in <u>Estelle</u>, 429 U.S. at 104, applies. <u>Olabisiomotosho</u>, 185 F.3d at 526; <u>Tamez v. Manthey</u>, 589 F.3d 764, 769-70 (5th Cir. 2009).

Applying this standard, Hmeid's allegations do not constitute violations of the Constitution. Two requirements must be met before Section 1983 liability will arise for constitutional violations relating to conditions of confinement of the type plaintiff described.

First, the alleged deprivation must objectively be "sufficiently serious," which means that "the inmate must show that he is incarcerated under conditions posing a substantial risk of harm." Farmer, 511 U.S. at 847. To rise to the level of a constitutional violation, the conditions must be "so serious as to deprive [plaintiff] of the minimal measure of life's necessities," in this case the basic human need for food and appropriate living temperatures. Alexander v. Tippah Cty., 351 F.3d 626, 630 (5th Cir. 2003) (quoting Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)).

Second, the inmate must show that a prison official was deliberately indifferent to inmate health or safety. Farmer, 511 U.S. at 847. A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837 (emphasis added). As noted above, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Southard, 114 F.3d at 551 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added). "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291 (citing Farmer, 511 U.S. at 838-40).

Hmeid's written allegations and testimony meet neither of these two requirements. The conditions described by plaintiff, cold food and low air-conditioning temperatures, while plainly not comfortable or pleasant, do not rise to a level of seriousness constituting

a constitutional violation.  Hmeid alleges no serious harm or risk of serious harm in the constitutional sense, and the court can perceive none under the circumstances described in plaintiff's testimony and written submissions.

The Constitution requires that prison officials provide prisoners with only reasonably adequate food, shelter and sanitation.  Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004) (citing Farmer, 511 U.S. at 832).  Courts have repeatedly held that the Constitution does not mandate prisons with ideally comfortable surroundings or commodious conditions.  Talib v. Gilley, 138 F.3d 211, 215 (5th Cir. 1998) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)); accord Hernandez v. Velasquez, 522 F.3d 556, 560 (5th Cir. 2008).

None of Hmeid's allegations about the conditions he experienced, including cold food and cold temperatures in the jail, establish constitutional violations.  See Davis, 157 F.3d at 1006 (no constitutional injury when plaintiff was confined in "filthy" cell for three days) (citing Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) (no constitutional violation when prisoner was exposed for four days to raw sewage from overflowed toilet in his cell)); Eady v. Head, No. CIVASA04CA0648 NN, 2006 WL 2663776, at *3 (W.D. Tex. Sept. 15, 2006) ("Going without a shower and being exposed to the foul smell of a backed-up shower for two days on two separate occasions does not show deliberate indifference to Plaintiff's basic human needs or constitute cruel and unusual punishment in violation of the Eighth Amendment."); Davis v. St. Charles Par. Corr. Ctr., No. 10-98, 2010 WL 890980, at *9 (E.D. La. Mar. 8, 2010) (Lemmon, J.) (citing Talib, 138 F.3d at

215; Wilson v. Lynaugh, 878 F.2d 846, 849 & n.5 (5th Cir. 1989)) (Inmate who complained of "unsanitary practice[s]," including inadequate ventilation, unsanitary water fountains, 52 inmates using one ice cooler, rest room four feet from the dining area, toilets leaking water and unsanitized living quarters, failed to state a claim. "Simply because [plaintiff's] dorm is less sanitary than he would like does not render the conditions unconstitutional.").

As to his complaints about cold food, Constitutional standards require only that prison authorities provide an inmate with "sufficient nutritional value to preserve health." Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999); Green v. Ferrell, 801 F.2d 765, 770 (5th Cir. 1986) (quoting Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977)).   The Constitution does not require that convicted inmates be provided with food at particular temperatures or every culinary amenity which one may find desirable.  Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom., Bell v. Wolfish, 441 U.S. 520 (1979) (citing Newman, 559 F.2d at 291); Murray v. Matty, 1985 WL 4948 at *1 (E.D. Pa. 1985); see Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (5th Cir. 1985), cert. denied, 475 U.S. 1096 (1986) ("The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."); McCoy v. Goord, 255 F.Supp.2d 233, 260 (S.D.N.Y. 2003) (denial of warm food is not, by itself, a deprivation of the minimal civilized measure of nutrition so as to support prisoner's Eight Amendment claim challenging conditions of confinement); Abdul-Akbar v. Dep't of Corrs., 910 F.Supp. 986, 1006 (D. Del. 1995), judgment aff'd 111

F.3d 125 (3d Cir. 1997) (prison officials did not violate the Eight Amendment where an inmate alleged that officials served cold meals on unsanitary carts because inmate failed to demonstrate that he was denied an "identifiable human need").

B)    <u>Privacy in Shower and Restroom Areas</u>

Plaintiff asserts that his privacy rights were violated because there was no partition wall between the shower and toilet areas of the Coleman dorm, and that the guards constantly watched the inmates in those areas from an observation pod.  The Supreme Court has declared that a prison inmate retains only those rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  In analyzing the privacy interests of prisoners themselves, the Ninth Circuit has stated: "The prisoners' [privacy] claims are best supported analytically under the fourth amendment's guarantee of one's <u>legitimate expectation of privacy</u> against unreasonable searches and seizures . . . and under the liberty component of the fourteenth amendment."  <u>Grummett v. Rushen</u>, 779 F.3d 491, 493 n.1 (9th Cir. 1985) (emphasis added).

In <u>Garrett v. Thaler</u>, 560 F. App'x 375 (5th Cir. 2014), the Fifth Circuit held that an inmate failed to state a constitutional claim when he alleged that "video recording cameras in the restrooms, showers, and dressing areas of the prison–as well as female officers' viewing of male inmates both in those areas and on the cameras–violate[d] his expectation of minimal privacy under the Fourth Amendment."  <u>Id.</u> at 380.  The court explained that

prisoners have a minimal right to bodily privacy. But, even if a prison regulation "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." To determine the reasonableness of a prison restriction, we consider the four factors outlined by the Supreme Court in Turner: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," (2) "whether there are alternative means of justifying that right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) "whether the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Weighing these factors, based on a summary judgment record, we rejected in Oliver [v. Scott], a similar challenge on the grounds that "constant surveillance, even cross-sex surveillance, of prisoners is constitutional because it is reasonably related to the penological interest of maintaining security." The [Oliver] court found that, as here, comprehensive surveillance by all guards increases the overall security of the prison, minimizing inmate-on-inmate violence and sexual assaults. Moreover, requiring only male guards to supervise inmates or doing away with security cameras in the bathroom and dressing areas could require the prison to increase staffing or reassign a large percentage of its staff, or both, and there is no readily identifiable alternative that would impose only de minimis expenses in terms of inmate security, staffing costs, or equal employment opportunities. Garrett makes no privacy-specific argument on appeal beyond his contention that "the placement of recording cameras in the restroom, shower, and dressing quarters in men's prisons only [is] a gender based discrimination, thus violating equal protection to privacy" and "4th Amendment reasonable expectation of privacy." In light of Oliver, Garrett's complaint, and his Spears hearing testimony, we affirm the magistrate judge's finding that his conclusional allegation of a privacy claim is indisputably meritless.

Id. at 380-81 (quoting Turner v. Safley, 482 U.S. 78, 89-90 (1987); Oliver v. Scott,

276 F.3d 736, 745-46 (5th Cir. 2002)) (citing Mitchell v. Quarterman, 515 F. App'x 244,

247 (5th Cir. 2012); Johnson v. Phelan, 69 F.3d 144, 147 (7th Cir. 1995); Timm v. Gunter,

917 F.2d 1093, 1101-02 (8th Cir. 1990); Michenfelder v. Sumner, 860 F.2d 328, 334 (9th

Cir. 1988)); accord Story v. Foote, 782 F.3d 968, 971-72 (8th Cir. 2015); Kemp v. Black

Hawk Cty. Jail, No. C15-2094-LRR, 2017 WL 581316, at *9 (N.D. Iowa Feb. 13, 2017)

(citing Story, 782 F.3d at 971-72; Garrett, 560 F. App'x at 308-81; United States v. Hogan,

539 F.3d 916, 923 (8th Cir. 2008); Timm, 917 F.2d at 1101-02; Patin v. LeBlanc, No. 11-

3071, 2012 WL 3109402, at *20 (E.D. La. May 18, 2012), report & recommendation

adopted, No. 11-3071, 2012 WL 3109398 (E.D. La. July 31, 2012).  While Garrett dealt

with female security personnel monitoring male inmates and with video monitoring, the

rationale applies equally to this case.

I find that Hmeid has failed to describe circumstances that would constitute a

violation of any constitutionally recognized privacy rights.  Plaintiff's own testimony

indicates that the circumstances about which he complains were measures designed to

enhance jail safety and security interests that outweigh an inmate's minimal privacy rights

in jail.  The guards' surveillance resulting in plaintiff being watched while he showered

and used the restroom does not amount to a constitutional violation of any recognized right

to privacy Hmeid may have had in jail.

Plaintiff had no expectation of privacy while using the restroom or showering in jail.

Inmates like Hmeid have no reasonable expectation that they will not be viewed by their

jailers while in the bathroom or shower.  As the Fifth Circuit found in Garrett, constant and

comprehensive surveillance is reasonably related to the penological interest of maintaining

security because such surveillance increases the overall security of the prison, minimizing

inmate-on-inmate violence and sexual assaults, and there is no readily identifiable

alternative that would impose only de minimis expenses in terms of inmate security,

staffing costs or equal employment opportunities. The actions of Coleman officials in watching inmates as they shower and use the restroom as part of their job functions are reasonably related to the penological interest of maintaining security.

V.      MAIL TAMPERING

Hmeid alleges that his mail was tampered with while he was in lockdown. Record Doc. No. 1 at p. 6. The Fifth Circuit has held that prison practices or restrictions concerning prisoner mail implicate two distinct but intertwined constitutional rights: (1) the right to access to the courts, which the Supreme Court has indicated lies in both the Due Process Clause and the First Amendment, Wolff v. McDonnell, 418 U.S. 539, 575-76 (1974), and (2) the right to freedom of speech guaranteed by the First Amendment. Walker v. Navarro Cty. Jail, 4 F.3d 410, 413 (5th Cir. 1993); Brewer v. Wilkinson, 3 F.3d 816, 820 (5th Cir. 1993). Specifically, the right of access to the courts is implicated only when the mail in question is legal in nature, while the right to free speech is relevant to claims involving both legal and non-legal mail.

Regardless what rights are implicated, however, it is clear that prisoners' constitutional rights with respect to mail are not absolute. A prison practice or regulation may permissibly interfere with an inmate's mail, including his legal mail, if the practice is "reasonably related to a legitimate penological interest." Morgan v. Quarterman, 570 F.3d 663, 666 (5th Cir. 2009) (quotation omitted) (citing Turner, 482 U.S. at 89); see Jackson v. Cain, 864 F.2d 1235, 1248 (5th Cir. 1989) (reasonableness standard applies to challenges to regulations as well as to actions of a prison official).

To the extent that Hmeid is complaining that the opening of his outgoing mail interfered with his constitutional right of access to the courts, it is well established that prisoners have such a constitutional right.  Bounds v. Smith, 430 U.S. 817, 821 (1977).  However, "[w]hile the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court." Vaccaro v. United States, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); accord Manning v. Sumlin, 540 F. App'x 462, 463 (5th Cir. 2013) (citing Lewis v. Casey, 518 U.S. 343, 356 (1996); Brewer, 3 F.3d at 821).

Significantly, to state a claim that his constitutional right of access to the courts was violated, Hmeid must demonstrate that his position as a litigant was actually prejudiced. Lewis, 518 U.S. at 356; Every v. Jindal, 413 F. App'x 725, 727 (5th Cir. 2011) (citing Lewis, 518 U.S. at 349-50; Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999)); Cochran v. Baldwin, No. 05-20100, 2006 WL 2418945, at *1 (5th Cir. Aug. 18, 2006; Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996).  It is not sufficient for a prisoner to establish only that his mail was opened outside of his presence or without his consent. Walker, 4 F.3d at 413.  The inmate must "demonstrate that the alleged shortcomings hindered his efforts to pursue a legal claim."  Lewis, 518 U.S. at 351.  In Lewis, the Supreme Court made clear that an inmate must establish actual injury to state a claim for denial of his right of access to the courts.  In examining the particular claims of the inmates in the Lewis case, the Court stated that the First Amendment right of prisoners to access

to the courts is the right to "have a reasonably adequate opportunity to file <u>non</u>frivolous legal claims challenging their convictions or conditions of confinement."  <u>Id.</u> at 356 (emphasis added).

In this case, Hmeid's written submissions, even as expanded upon by his <u>Spears</u> testimony, fail to state a cognizable Section 1983 claim for violation of his rights of either access to the courts or free speech.  As to his First Amendment right of access to the courts claim, Hmeid fails completely to allege actual injury to his position as a litigant, as required in <u>Lewis</u> and its progeny.  The alleged misplacement of his legal mail while he was in lockdown had no effect that Hmeid could identify on his court proceedings, and his access to the courts was not prejudiced in any way.  His testimony established that his criminal proceedings, during which he acknowledged he was represented by counsel, were not affected by his allegedly missing legal papers.  Neither his written submissions nor plaintiff's testimony establishes that he suffered actual injury or legal prejudice of any kind resulting from the alleged tampering with his legal mail.  Accordingly, to the extent Hmeid claims that the mail tampering interfered with his access to the courts, his claim is legally frivolous and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

As to his free speech rights, Hmeid does <u>not</u> allege deprivation of outgoing mail delivery.  He testified that he was missing documents, but he did not testify that his mail was undelivered or delayed.  The Supreme Court "has never held that reading inmate mail violates the First Amendment."  <u>Busby v. Dretke</u>, 359 F.3d 708, 722 (5th Cir. 2004).

Nonetheless, "'[a] prison official's interference with a prisoner's legal mail . . . may violate the prisoner's First Amendment right to free speech–i.e., the right to be free from unjustified government interference with communication.'"  Damm v. Cooper, 288 F. App'x 130, 132 (5th Cir. 2008) (quoting Brewer, 3 F.3d at 820).  However, the Fifth Circuit has recognized a legitimate penological need for prison "personnel to open, review and occasionally censor outgoing mail" because of concerns about possible threats to prison security, including ensuring that the mail does not contain contraband.  Franco v. Collins, No. 2:14-CV-148, 2015 WL 136544, at *1 (S.D. Tex. Jan. 8, 2015) (citing Busby, 359 F.3d at 721); McCartney v. Keith, No. 14-CV-230, 2014 WL 5092017, at *2 (W.D. La. Oct. 9, 2014) (citing Busby, 359 F.3d at 721).

In the instant case, the inspection of Hmeid's outgoing mail did not result in his mail being undelivered or delayed.  On the contrary, Hmeid testified that he sent a letter to his attorney.  In addition, he alleges that the "tampering" occurred while he was in disciplinary lockdown, a circumstance reasonably requiring increased vigilance by jail officials relating to security.  The handling of Hmeid's mail in these circumstances does not, standing alone, state any violation of his First Amendment free speech rights, when he was not deprived of mail delivery at all.

For the foregoing reasons, plaintiff's mail claim is legally frivolous in all respects and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

VI.    RECREATION TIME

Hmeid also alleges that he did not receive sufficient outdoor recreation time during his imprisonment at Coleman.  He complains that he was taken outside for recreation only once or twice a week for only 30 to 35 minutes.  He clarified that his complaint concerning recreation is that he should have been allowed 45 minutes of recreation time every day.

The Fifth Circuit "has held that deprivation of exercise may constitute an impairment of health, which is actionable under the Eighth Amendment, and that the absence of outdoor exercise opportunities may constitute an Eighth Amendment violation." Hewitt v. Henderson, 271 F. App'x 426, 428 (5th Cir. 2008) (citations omitted) (emphasis added).  While neither the Fifth Circuit nor the United States Supreme Court has ever specifically held that inmates enjoy an absolute right to out-of-cell exercise, the Fifth Circuit has repeatedly held that an extended deprivation of exercise opportunities might impinge upon an inmate's Eighth Amendment rights depending upon the particular facts of a given case." Doolittle v. Holmes, No. 06-986-C, 2010 WL 22552, at *4 (M.D. La. Jan. 4, 2010) (citing Hewitt, 271 F. App'x at 428; Green, 801 F.2d 765; McGruder v. Phelps, 609 F.2d 1023 (5th Cir. 1979)) (emphasis in original).

However, it is clear that inmates have no protected liberty interest in specific or any particular amount of outdoor recreational opportunities, and the "[d]eprivation of exercise is not a per se constitutional violation." Lewis v. Smith, 277 F.3d 1373, 2001 WL 1485821, at *1 (5th Cir. 2001) (citing Stewart v. Winter, 669 F.2d 328, 336 n.19 (5th Cir. 1982); Miller v. Carson, 563 F.2d 741, 751 n.12 (5th Cir. 1977)); accord Sampson v. Corrs.

- 36 -

Corp., No. 08-CV-0915, 2009 WL 837640, at *16 (W.D. La. Mar. 26, 2009) (citing Smith v. Boyd, 945 F.2d 1041, 1043 (8th Cir. 1991); Lato v. Attorney Gen., 773 F. Supp. 973, 978 (W.D. Tex. 1991) (citing Beck v. Lynaugh, 842 F.2d 757, 762 (5th Cir. 1988)).  To succeed on a claim under Section 1983 for lack of exercise, a prisoner must establish "the existence of any health hazard under the specific circumstances involved." Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir.), amended in part, vacated in part on other grounds, 688 F.2d 266 (5th Cir. 1982); accord Delaney v. DeTella, 256 F.3d 679, 684 (7th Cir. 2001); Green, 801 F.2d at 771.

As an initial matter, Hmeid's own testimony establishes that he was not subjected to an absolute deprivation of outdoor exercise.  His complaint is merely that he was not provided with as much time outdoors as frequently as he has received in DOC facilities. In addition, Hmeid's testimony and medical records do not support the conclusion that his once- or twice-a-week outdoor exercise caused him to suffer any health impairment that was serious or even related to lack of outdoor recreation.  Conditions of confinement may rise to the level of a constitutional violation only if they result in "a serious or significant . . . injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir.), cert. denied, 114 S. Ct. 393 (1993) (emphasis added); accord White v. Gregory, 1 F.3d 267, 269 (4 Cir. 1993), cert. denied, 114 S.Ct. 931 (1994).  Any harm that Hmeid may have suffered by the minor maladies he describes in this case were not serious and did not rise to the level of a constitutional violation. See, e.g., Wesson, 910 F.2d at 284 (swollen wrists with some bleeding not serious); Griffin, 557 F. Supp. at 306

(aches and sore throat not serious); cf. Barker v. Brantley Cty., 832 F. Supp. 346, 352 (S.D. Ga. 1993), aff'd 19 F.3d 37 (11th Cir. 1994) (pneumonia is serious medical need).

As discussed above in connection with his medical care claim, plaintiff certainly did not suffer "a life-long handicap or permanent loss" of the type required to constitute a serious medical need for constitutional purposes. See Hill, 40 F.3d at 1188; Monmouth Cty., 834 F.2d at 347 (medical need is serious when it "results in an inmate's suffering 'a life-long handicap or permanent loss'"); Dickson, 569 F.2d at 1311 (no serious medical need when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health). Hmeid's minor ailments do not rise to the level of serious medical needs implicating any constitutional violation arising from his once- or twice-a-week recreation time.

VII.   HOUSING CLASSIFICATION/DOC INMATES AND PARISH INMATES HOUSED TOGETHER

Hmeid alleges that, as a convicted DOC inmate, he was improperly housed with pretrial detainee parish inmates, although no actual injury or physical harm resulted from his housing assignment. In Jones v. Diamond, 636 F.2d 1364 (5th Cir. 1981),[2] the en banc Fifth Circuit stated that

> [t]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is "reasonably related to the institution's interest in maintaining jail security," or physical facilities do not permit their separation. Of course, if a particular pretrial detainee has a

---

[2] Overruled on other grounds by Int'l Woodworkers v. Chamption Int'l Corp., 790 F.2d 1174 (5th Cir. 1986), aff'd sub. nom. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437 (1987).

> long record of prior convictions or is likely to be violent, imposition of
> greater security measures is warranted . . . . Nonetheless, pretrial detainees
> have a due process right to be considered individually to the extent security
> and space requirements permit.

Id. at 1374 (quoting Bell, 441 U.S. at 531) (additional citations omitted).  Thus, the Fifth

Circuit in Jones recognized that the housing of pretrial detainees with convicted inmates

may raise concerns about the due process rights of the pretrial detainees, not vice versa as

Hmeid alleges, but only if the pretrial detainees' classification together with convicted

inmates is handled indiscriminately without justification.  Pembroke v. Wood Cty., 981

F.2d 225, 229 (5th Cir. 1993); Lathers v. Nelson Coleman Corr. Ctr., 2010 WL 1489903,

at *7-8 (E.D. La. Mar. 22, 2010), report & recommendation adopted, 2010 WL 1485468

(E.D. La. Apr. 13, 2010).  However, the Fifth Circuit has also recognized that the housing

of pretrial detainees with convicted inmates is permissible under some circumstances.

Significantly, the classification of inmates is an administrative function of the

prison.  Jones, 636 F.2d at 1376.  Courts accord great deference to prison officials'

administrative decisions and will not interfere with legitimate administration without a

constitutional violation.  Bell, 441 U.S. at 547-48; Smith v. Bingham, 914 F.2d 740, 742

(5th Cir. 1990).  "Inmates have a federal right to due process at prison

classification . . . only if state law contains 'substantive predicates' limiting the prison

administrators' discretion to classify, assign, and punish inmates."  Ricker v. Leapley, 25

F.3d 1406, 1409 (8th Cir. 1994); accord Woods, 51 F.3d at 582 (citing Hewitt v. Helms,

459 U.S. 460, 469-70 (1983)); Canterino v. Wilson, 869 F.2d 948, 953 (6th Cir. 1989)

(citing Hewitt, 459 U.S. at 472).  "Classification of inmates in Louisiana is a duty of the [jailer] and an inmate has no right to a particular classification under state law."  Woods, 51 F.3d at 581-82 (quotation omitted).

Thus, "[i]nmates have no protectable property or liberty interest in custodial classification.  The classification of prisoners is a matter within the discretion of prison officials.  Absent an abuse of discretion, federal courts are loathe to interfere with custodial classifications established by prison officials."  Whitley v. Hunt, 158 F.3d 882, 889 (5th Cir. 1998) (citations omitted), abrogated on other grounds by Booth v. Churner, 532 U.S. 732, 735 (2001); accord Jones v. Roach, 196 F. App'x 287, 288 (5th Cir. 2006); Wilkerson v. Stalder, 329 F.3d 431, 436 (5th Cir. 2003).

In this instance, Hmeid was a convicted DOC inmate, not a pretrial detainee. Housing Hmeid together with pretrial detainees, who had not yet been convicted, cannot be characterized as arbitrary, indiscriminate or as an abuse of discretion the law assigns to prison officials as to convicted DOC inmates like Hmeid and with which this court should not interfere.   No discernible harm to Hmeid occurred as a result of the housing classification about which he complains, and no violation of Hmeid's constitutional rights occurred under these circumstances.

## VIII.   IMPROPER DEFENDANT

Hmeid has named the Nelson Coleman Correctional Center as a defendant. However, this defendant is not a legal entity with the capacity either to sue or to be sued. Section 1983 claims may be asserted only against "persons" as the statute and case law

define that term. The Nelson Coleman Correctional Center is <u>not</u> an entity that can be sued under Section 1983 because it is not a juridical entity under state law capable of being sued and/or because it is not a person for purposes of suit under Section 1983. <u>Cage v. Kenty Cty. Corr. Facility</u>, 113 F.3d 1234, 1997 WL 225647, at *1 (6th Cir. 1997); <u>Johnson v. LCDC Med. Staff</u>, No. 4:09-cv-13, 2009 WL 1256906, at *2 (E.D. Tenn. Apr. 29, 2009); <u>Holifield v. Mobile Cty. Sheriff's Dep't</u>, No. 07-0321-CG-C, 2008 WL 2246961, at *5 (S.D. Ala. May 29, 2008); <u>Cullen v. DuPage Cty.</u>, No. 99C1296, 1999 WL 1212570, at *1 (N.D. Ill. Dec. 14, 1999); <u>Whitley v. Westchester Cty. Corr. Facility Admin.</u>, No. 97CIV0420(SS), 1997 WL 659100, at *6 (S.D.N.Y. Oct. 22, 1997); <u>Sponsler v. Berks Cty. Prison</u>, No. 95-1136, 1995 WL 92370, at *1 (E.D. Pa. 1995); <u>Powell v. Cook Cty. Jail</u>, 814 F. Supp. 757, 758 (N.D. Ill. 1993).

Thus, all claims against the Nelson Coleman Correctional Center as a named defendant must be dismissed as legally frivolous.

## <u>RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's complaint against Nelson Coleman Correctional Center and his claims concerning his medical care, conditions of confinement, mail tampering, recreation time and housing classification against individual defendants Charles Floyd, David Bailey, Rocco Dominic and Darryl Richardson be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

**IT IS FURTHER RECOMMENDED** that further proceedings are required as to plaintiff's remaining excessive force claim under Section 1983 against defendants Charles Floyd, David Bailey, Rocco Dominic and Darryl Richardson.

A jury trial has been demanded. Record Doc. No. 12. Accordingly, **IT IS FURTHER RECOMMENDED** that the assigned magistrate judge be directed to determine (a) if counsel should be appointed from this court's Civil Pro Bono Panel to represent plaintiff in this matter, and (b) if all parties consent to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[3]

New Orleans, Louisiana, this ____15th____ day of August, 2018.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[3]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.